## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DENNIS PRINCE BARNES,

    Petitioner,

    v.

                                   Civil Action No.:  SAG-22-1393

KEITH K. ARNOLD, and
MARYLAND ATTORNEY GENERAL

    Respondent.

## MEMORANDUM OPINION

Petitioner Dennis Prince Barnes has filed a Petition for Writ of Habeas Corpus.  ECF 1 (the "Petition").  Respondents initially filed a Limited Answer to the Petition asserting that the claims are time-barred.  ECF 9. The Court issued an Order on April 22, 2025 denying Respondents' timeliness defense and ordering Respondents to file a Supplemental Answer. ECF 15. Respondents complied (ECF 17), but also filed a Motion to Certify Question of Law for Interlocutory Appeal. ECF 16. The Court denied the motion, finding immediate appeal of ECF 15 to be inappropriate.[1] ECF 18. Barnes's Petition is now ripe for adjudication on its merits.

No hearing is required.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons that follow, I shall deny the Petition.  A certificate of appealability shall not issue.

---

[1]      On the same day that the Court issued the Order denying Respondents' Motion to Certify, Barnes filed an opposition he styled and docketed as a "motion." ECF 19. Barnes's "motion" is denied as moot as part of the Court's Order denying habeas relief.

**Background**

On July 13, 2011, Barnes was indicted on five counts in the Circuit Court for Cecil County related to the death of Donald Fisher. ECF 9-1 at 7, 9. Barnes proceeded to trial by jury on February 4-12, 2013. ECF 17-3, 17-4, 17-5, 17-6, 17-7, 17-8, 17-9. The jury found him guilty of first degree murder. ECF 17-9 at 3. On April 16, 2013, Barnes was sentenced to life imprisonment, with all but sixty-five years suspended. ECF 17-10 at 100. The Appellate Court of Maryland[2] issued an opinion on July 16, 2014, describing the facts as follows:

> On June 30, 2011, at 3:08 a.m., paramedics responded to a call for a "cardiac arrest" at 243 and 241 East Main Street, Cecil County, Maryland, where they found Donald Fisher age 22, lying in an alley. Fisher had sustained twelve wounds—stabs and cuttings—to his chest and arm area and died. The police arrested Barnes for the murder around 2:30 p.m. that afternoon. Detective Andrew Tuer of the Elkton Police Department, the lead investigator, interviewed Barnes at about 6:10 p.m., and Barnes asserted self-defense.
>
> On February 4, 2013, a jury trial was held. The State presented no eyewitness testimony, but the State did present testimony from three individuals with whom Fisher had been using cocaine prior to the incident—his mother, Donna J. Porter, and Patricia Hinshaw ("Mrs. Hinshaw"), and Jerry Hinshaw ("Mr. Hinshaw"). Porter and the Hinshaws testified to different versions of events.
>
> Porter testified that she and Fisher lived at 243 East Main Street, Apartment 7. She testified that on June 29, 2011, she heard her son and the Hinshaws, who lived in Apartment 5, say they were "going to rob" Barnes and take his cocaine. Hours later, at 1:50 a.m., Porter stated that she heard Mr. Hinshaw tell Fisher he needed backup. Fisher went to the Hinshaws' apartment and Porter followed.
>
> In the Hinshaws' apartment, Porter saw Fisher, Mr. Hinshaw, and Barnes with drugs "sitting on the corner of the coffee table." When Porter told Fisher to leave, Fisher grabbed the drugs off the table and ran past her out the door. Mr. Hinshaw ran after Fisher, followed by Barnes. Porter then returned to her apartment and later learned about her son's death from the police.

---

[2]    In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved changing the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022.  *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR.

Both Mr. and Mrs. Hinshaw testified they had bought cocaine from Barnes on June 29, 2011 and consumed it with Porter and Fisher. Mr. Hinshaw stated that they were paying for the drugs with pills because they had run out of money, and for a large number of pills, they received a small amount of cocaine. According to Mr. Hinshaw, he, Mrs. Hinshaw, Porter, and Fisher came up with a plan to steal Barnes's drugs. They planned to ask Barnes to bring cocaine to the Hinshaws' apartment which they would then steal. The plan was for Fisher and Mr. Hinshaw to persuade Barnes to put the drugs on the table for them to try and then for Porter to knock on the door, at which point Fisher would grab the cocaine and run out the door.

Mr. Hinshaw testified that on June 30, 2011, around 2:30 a.m., Fisher sampled the cocaine Barnes brought to the Hinshaws' apartment by using a razor blade to cut the cocaine and a syringe to consume it. Porter then knocked on the door and, when it opened, Fisher took the cocaine and fled. According to Mr. Hinshaw, Barnes ran after him, and Mr. Hinshaw followed. Once outside, Mr. Hinshaw saw Fisher go "to the left" while Barnes went "to the right," and Mr. Hinshaw fell and lost sight of them. Mr. Hinshaw returned to the apartment, soon thereafter, and could not recall how much time went by before he heard from Fisher or Barnes after he lost sight of them in the chase.

Mr. Hinshaw testified that sometime later Barnes yelled to him, asking Mr. Hinshaw to look for Fisher. Mr. Hinshaw went looking for Fisher and found him lying in an alley and called 911. Mr. Hinshaw stated that the time lapse between when he, Fisher, and Barnes ran out of the apartment until he found Fisher in the alley "could have been fifteen" or twenty minutes. Mr. Hinshaw called Barnes and asked him what he had done. Barnes then went to Mr. and Mrs. Hinshaw's house stating that he wanted to "get his shit out of here."

Mrs. Hinshaw testified that from Porter's apartment she heard Porter knock on the door, the door open, and what sounded like "a herd of cattle going down the stairs." Mrs. Hinshaw stated that she went outside and saw Barnes returning from the dumpsters to his apartment building. She testified that she heard him panting and talking to himself. Mrs. Hinshaw thought he said, "I killed that mother-fucker." Finally, she stated that she did not know the time period between when she heard people running downstairs to when she saw Barnes in the driveway.

John Ringgold, a cab driver in Elkton, testified that on June 30, 2011, at 7:00 a.m., he picked up Barnes. Ringgold testified that Barnes, a regular customer of his, was "sort of quiet." Ringgold then asked Barnes if he was fine, and Barnes stated that people had tried to rob him, and he had disarmed a man with a knife.

The defense presented three witnesses: Rayen Matthews, Charles Farmer, and Barnes. Rayen Matthews testified that, in 2009, Fisher had chased him home threatening him with a knife.

3

Charles Farmer, a friend of Barnes, testified that around 3:30 a.m. on June 30, 2011, Barnes arrived at his home and was "crying" and "real upset." Farmer testified that Barnes told him that a bigger man had tried to rob him, and that Barnes chased him. Farmer also testified that Barnes said during the chase he got caught under a fence, and the bigger man jumped on top of him. Farmer stated that Barnes was scared and used the knife in an attempt to get the bigger man off of him and that Barnes stayed at his home until 7:30 a.m.

Barnes testified, on his own behalf, that he was a construction worker and sold drugs "to some degree." Barnes stated that at about 2:00 a.m. on June 30, 2011, the Hinshaws contacted him about buying drugs, and he arrived at the Hinshaws' apartment at about 2:44 a.m. He observed Fisher use a knife to cut the drugs, put the drugs in a spoon, and inject himself with the drugs. When Fisher fled with the drugs, Mr. Hinshaw ran after Fisher, and he followed Mr. Hinshaw.

When Barnes was at the front door of the building he saw, who he thought was, Mr. Hinshaw by the dumpster. When Barnes ran around the corner, however, he collided with Fisher, and both fell to the ground. According to Barnes, when Fisher dropped a knife, both he and Fisher lunged for it, and he reached the knife first. Barnes tried to get up, but Fisher pushed him down against the fence. As Barnes tried to stand, his sneaker got tangled in the fence, Fisher placed him in a choke hold, and said that he was going to kill Barnes. The two struggled and Barnes said that he was swinging the knife aimlessly to try to make Fisher get off of him. When Fisher stepped back, Barnes dropped the knife, untangled his shoe, ran home, and left the knife behind. Barnes believed that, between the time when he arrived at the Hinshaw home to when he called Mr. Hinshaw on the phone, following the struggle, six minutes had elapsed.

After the incident, Barnes testified that he called his girlfriend, Sharmane, and told her: "This guy tried to rob me today, and . . . we got to chasing him behind the house and he pulled a knife out on me. We was wrestling for it and he fell [and i]t stabbed him." Barnes then grabbed the knife. Barnes testified to telling Sharmane not to say that she had spoken to him.

The record indicates that the police searched Sharmane's apartment and seized three knives which did not show positive results for the presence of blood. The record indicates that no weapons were recovered from the area where Fisher was found, and that the Hinshaws' apartment was never searched.

ECF 9-1 at 104-109. Barnes appealed his conviction to the Appellate Court of Maryland, which affirmed his conviction and sentence.[3] *Id.* at 103-122. The Supreme Court of Maryland subsequently denied Barnes's petition for a writ of certiorari. *Id.* at 124-144, 157.

On September 22, 2017, Barnes filed a petition for postconviction relief. *Id.* at 216-309. Barnes asserted numerous claims for relief, including the claims he has now raised in his federal habeas Petition. *See* ECF 9-1 at 386-395. The trial court held a hearing on May 21, 2021 (ECF 17-14) and issued an opinion on August 3, 2021 dismissing the petition. ECF 9-1 at 408-447. On September 3, 2021, Barnes applied for leave to appeal the denial of his petition with the Appellate Court of Maryland. *Id.* at 448-464. Leave was denied on November 19, 2021. *Id.* at 465-467.

Barnes filed his federal habeas corpus Petition on June 1, 2022. ECF 1. He raises four grounds for relief: (1) ineffective assistance of trial counsel for failure to object to improper voir dire questions, (2) denial of the right to a public trial when the courtroom was closed during voir dire, (3) ineffective assistance of appellate counsel for failure to assert the improper closure of the courtroom as an assignment of error on appeal, and (4) ineffective assistance of trial counsel for failure to object the prosecutor's "Golden Rule" argument during rebuttal.[4] ECF 1-1 at 12-19. Respondents assert in their Supplemental Answer that Barnes's claims are meritless. ECF 17 at 17-66.

## Standards of Review

### 1. 28 U.S.C. § 2254

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28

---

[3]    On appeal, Barnes asserted five assignments of error, none of which are pertinent to his federal habeas petition.

[4]    The wording of Barnes's grounds for relief have been rephrased for clarity.

U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall*, 572 U.S.415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

6

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

### 2. Ineffective Assistance of Counsel

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 580 U.S. 100, 118 (2017); *United States v. Ductan*, 800 F.3d 642, 648 (4th Cir. 2015). To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687-88; *see Williams (Terry)*, 529 U.S. at 390; *United States v. Sutherland*, 103 F.4th 200,

207-08 (4th Cir. 2024); *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).

First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 580 U.S. at 118; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229. The petitioner must prove his claim by a preponderance of the evidence. *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *United States v. Pettiford*, 612 F.3d 270, 277 (2010).

With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington*, 562 U.S. at 104; *Sutherland*, 103 F.4th at 207–08; *United States v. Richardson*, 820 F. App'x 225, 225 (4th Cir. 2020); *Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court recently reiterated that the "first prong sets a high bar." *Buck*, 580 U.S. at 118. Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (citation omitted). The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669. Judicial scrutiny of counsel's performance must be

"'highly deferential'" and not based on hindsight. *Stokes v. Stirling*, 10 F.4th 236, 246 (4th Cir. 2021) (citing *Strickland*, 466 U.S. at 689).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the *Strickland* standard must be applied with scrupulous care," because "the standard of judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105; *see United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019). Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence v. Branker*, 517 F.3d 700, 708 (4th Cir. 2008) (quoting *Strickland*, 466 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Harrington*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015). Therefore, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 580 U.S. at 119. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687; *see Thornell v. Jones*, 602 U.S. 154, 155 (2024) (death penalty case).

In the context of ineffective assistance of appellate counsel, to establish *Strickland's* performance prong, a movant must first show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Counsel is "not obligated to assert all nonfrivolous issues on appeal," *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000), and courts presume that the appellate counsel "decided which issues were most likely to afford relief on appeal," *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). The "prejudice" element of the *Strickland* standard is satisfied by a showing of a reasonable probability defendant would have prevailed on appeal but for appellate counsel's deficient performance. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* at 288 (internal quotation marks and citation omitted).

A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Strickland*, 466 U.S. at 696. Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

*Strickland*, 466 U.S. at 697.  Nor must a court address both components if one is dispositive.  *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015).  This is because failure to satisfy either prong is fatal to a petitioner's claim.  As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

**Analysis**

**Ground One**

In Ground One, Barnes contends that his trial counsel was ineffective for failing to object to the following improper compound voir dire questions:

> Does anyone have such strong feelings concerning drugs that you would be unable to render a fair and impartial verdict in a case involving drug use and sale?[5]

> You may or may not hear evidence or allegations of drug activity or drugs and you may hear testimony from individuals whose language may be colorful in some respect if you understand what I'm saying. Is there anything about these charges or the potential evidence or language that you may hear from witnesses that would affect your ability to render a fair and impartial verdict based solely upon the evidence you are going to hear in the courtroom?

> As you may have noticed, Mr. Barnes is a black man, African American. Does that fact alone prevent any of you from rendering a fair and impartial verdict based solely upon the evidence you hear in the courtroom?

> Generally, though would any of you –do any of you have any feelings or beliefs regarding self-defense that would, again, affect your ability to render a fair and impartial verdict based solely upon the evidence you are going to hear in the courtroom?

> Do any of you believe that you would allow anger, resentment, passion or other emotions to somehow influence your verdict in this particular case or do you believe that any of those emotions could somehow affect your ability to render a fair and impartial verdict based solely upon the evidence?

> Now, do any of you know any other reason whatsoever that you think we should know about that may somehow affect your ability to be fair and impartial in this particular case and affect your ability to render and fair and impartial verdict based solely on the evidence?

---

[5] The first question noted by Barnes in his Petition does not appear in the trial transcript. The remaining questions are found at ECF 17-3 at 35, 36, 39, 40.

ECF 1-1 at 7. The postconviction court denied Barnes's claim on this issue, concluding:

> Based on the law as it existed at the time of trial, Mr. Barnes' trial counsel's failure to object to the two-part voir dire questions was not a deficiency in counsel's defense of Petitioner. Attorneys cannot be expected to anticipate a change in case law and [sic] because trial counsel's performance is judged upon the situation as it existed at the time of trial.

ECF 9-1 at 423 (internal quotations and citations omitted). Barnes argues, as he did in his postconviction petition, that the questions violated *Dingle v. State*, 361 Md. 1 (2000), which prohibits questions that require the prospective jurors to evaluate their own bias. The circuit court denied Barnes's claim. ECF 9-1 at 421-423. Upon review of the applicable precedent, the Court finds that the postconviction court's conclusion was neither contrary to nor an unreasonable application of federal law.

The law on compound jury selection questions evolved over a fourteen-year period in Maryland, starting with the decision in *Dingle* and concluding on February 21, 2014, with the decision in *Pearson v. State*, 437 Md. 350 (2014). In *Dingle*, the Appellate Court of Maryland held that the trial court erred when it asked several two-part questions concerning (1) whether jurors had certain experiences or associations or views and (2) whether those experiences, associations, or views would affect their ability to be fair and impartial. *Dingle,* 361 Md. at 8-9. The *Dingle* court found the questions objectionable because they "endorse[] a voir dire process that allows, if not requires, the individual voir dire venire person to decide his or her ability to be fair and impartial...the procedure…shifts from the trial judge to the venire the responsibility to decide juror bias." *Id.* at 21.

Despite its ruling in *Dingle,* in 2002 the Appellate Court of Maryland approved the phrasing of a self-assessment question in *State v. Thomas*, 369 Md. 202 (2002). The issue in *Thomas* was whether the trial court erred in refusing to ask, "Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and

impartially weigh the facts at trial where narcotics violations have been alleged?"  The Appellate Court of Maryland found that the trial court erred by not permitting the question.  After *Thomas* was decided, "[as] of May 10, 2002…the state of the law appeared to be that *Dingle* did not apply to a 'strong feelings' compound question." *State v. Davis*, 249 Md. App. 217, 226 (2021).

Following *Thomas*, the Appellate Court of Maryland affirmed similar two-part questions in *Sweet v. State*, 371 Md. 1 (2002) ("Do the charges stir up strong emotional feelings in you that would affect your ability to be fair and impartial in this case?"); *Baker v. State*, 157 Md. App. 600 (2004) ("Do you have any bias or prejudice concerning handguns which would prevent you from fairly weighing the evidence in this case?"); *Singfield v. State*, 172 Md. App. 168 (2006) ("Does any member of the jury panel feel that the nature of this case would make it difficult or impossible for you to render a fair and impartial verdict, specifically because this case involves murder with a handgun?"); and *State v. Shim*, 418 Md. 37 (2011) ("Does any member of the jury have such strong feelings about [the charges] that it would be difficult for you to fairly and impartially weigh the facts?"); *Wimbish v. State*, 201 Md. App. 239, 267 (2011) ("Does any member of the panel have any fixed opinions, biases or prejudices, about people of a particular race which would affect your ability to render a fair and impartial verdict in this case based solely on the law and the evidence?").

However, on February 21, 2014, the Appellate Court of Maryland, in *Pearson v. State*, 437 Md. 350 (2014), abrogated the precedent that permitted two-part "strong feelings" questions. The *Pearson* court recognized that while *Dingle* prohibited two-part questions that required the jurors to assess their own bias, the "strong feelings" line of cases that followed and specifically permitted such two-part questions created a conflict in the law. *Id.* at 361-363. Thus, there was a period of time in Maryland, between the date of the *Dingle* decision in 2000 and the date of the *Pearson* decision in 2014, when two-part, "strong feelings" questions were permissible during voir dire.

Barnes's trial concluded a year before the *Pearson* decision issued, during the timeframe when Maryland allowed two-part "strong feelings" questions that required the jurors to conduct a self-assessment of bias. The postconviction court reached the conclusion that Maryland law permitted those questions at the time of Barnes's trial, and this Court is bound to defer to that conclusion. *See Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law ... binds a federal court sitting in habeas corpus.").

Accordingly, the postconviction court was not unreasonable for concluding that Barnes's counsel was not deficient for failing to object to the compound voir dire questions. Ground One is without merit and is dismissed.

**Grounds Two and Three**

Grounds Two and Three are related and will be addressed together. In Ground Two, Barnes contends that his right to a fair trial was violated because the courtroom was closed to the public during voir dire. ECF 1-1 at 12-16. In Ground Three, Barnes contends that his appellate counsel was ineffective for failing to raise this issue as an assignment of error on appeal. *Id.* at 17.

The record reflects that voir dire began in Cecil County on February 4, 2013. ECF 17-3. Before questioning commenced, the trial judge made a couple of comments regarding the small size of the courtroom and the large size of the venire. *Id.* at 3-5. After the jurors were questioned as a group, they were brought individually into the "jury room" to provide specific answers to any affirmative responses from the trial judge and attorneys. *Id.* at 45-158. The process then reconvened the courtroom for the attorneys to select the panel. *Id.* at 158. At that time, the trial judge commented it was "so crowded" and referred to members of the venire who were standing in the aisles. *Id.* at 160. The transcript includes no notation that either party requested that the courtroom be closed during

voir dire or that the trial judge ordered its closure. There is also no indication that either the trial judge or the attorneys were aware that anyone was excluded from the courtroom during the proceedings.

During the postconviction hearing on May 21, 2021, Sharmane Whalen, Barnes's girlfriend, testified that the guard at the door prevented her from entering during voir dire. ECF 17-14 at 46-53. Catherine Barnes, who identified herself as Barnes's cousin, also testified that she, Whalen, and Barnes's sister, Danielle Barnes, were excluded from the courtroom during voir dire. *Id.* at 54-56. Catherine Barnes testified that the victim's family was permitted entry. *Id.*

Barnes raised Ground Two in his postconviction petition. ECF 9-1 at 423-431. The postconviction court made findings of fact from the trial transcript and the postconviction testimony that the trial judge did not order the closure of the courtroom, and Barnes's family was only excluded during voir dire and jury selection. ECF 9-1 at 427-428. Relying on the "triviality exception," explained in detail below, the postconviction court concluded that a partial closure of courtroom to defendant's family during voir dire did not implicate defendant's Sixth Amendment constitutional right to public trial. *Id.* at 424-428.

The Sixth Amendment directs, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ...." U.S. Const. amend. VI. The constitutional right to a public trial remains grounded in the belief that "'judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings,'" *Waller v. Georgia,* 467 U.S. 39, 46 n. 4, (1984) (quoting *Estes v. Texas,* 381 U.S. 532, 588 (1965). Violation of the right to a public trial is a structural error, and therefore, if objected to at trial, can be reversed without any need to show prejudice. *Weaver v. Massachusetts*, 582 U.S. 286 (2017).

The right is not absolute, however, and the Supreme Court has long recognized that trial judges have discretion to impose reasonable limitations on access to a trial when overriding interests, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information," are likely to go unprotected if closure is not employed. *Waller,* 467 U.S. at 45.  In *Waller v. Georgia*, the Supreme Court likewise held that the right to a public trial may give way if:

(1) the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced,
(2) the closure is no broader than necessary to protect that interest,
(3) reasonable alternatives to closing the proceeding are considered by the trial court,
(4) and findings adequate to support the closure are made by the trial court.

*Id.* at 48. The Supreme Court recognized in *Presley v. Georgia*, 558 U.S. 209, 213 (2010), that "the Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors."

Following the United States Supreme Court decision in *Waller*, the Second Circuit in *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996), ruled that an unjustified temporary closure in that case was "too trivial to amount to a violation" of the right to a public trial. *Id*. at 42. The Second Circuit explained that a triviality standard looks to "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant ... of the protections conferred by the Sixth Amendment." *Id*. Where "the values furthered by the public trial guarantee" were not jeopardized when the trial court briefly neglected to reopen the courtroom after an undercover officer finished testifying, the court held that the defendant's rights were not infringed. *Id*. at 43-44. Several courts have adopted the *Peterson* approach, *e.g.*, *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007); *Braun v. Powell*, 227 F.3d 908, 918-20 (7th Cir. 2000), *United States v. Izac*, 239 F. App'x 1, 4 (4th Cir. 2007), and have continued to apply it after *Presley*. *See United States*

*v. Lewis*, No. 19-6148, 2022 WL 216571, at *7-8 (6th Cir. Jan. 25, 2022) (deputy marshal for twenty minutes excluded two spectators who were speaking loudly); *United States v. Anderson*, 881 F.3d 568, 573 (7th Cir. 2018) (trial continued after courthouse was locked for the night at 5:00 p.m.); *United States v. Patton*, 502 F. App'x 139, 141-42 (3d Cir. 2012) (members of defendants' families allegedly denied entry during jury selection because courtroom was filled to capacity); *United States v. Shipp*, No. 21-1284-CR, 2022 WL 16543193, at *1 (2d Cir. Oct. 31, 2022) (brief introductory remarks made outside presence of defendant, his counsel, and the public).

In a case very similar to Barnes's, *United States v. Greene*, 431 F. App'x 191 (3d Cir. 2011), the Third Circuit Court of Appeals employed the triviality exception where the closure was limited, done without the knowledge of the trial judge, and no objection was made. In *Greene*, the facts were described as follows:

> Greene claimed his Sixth Amendment right to a public trial was violated when a court security officer (CSO) temporarily excluded his brother, Curtis Fredericks, from the courtroom on the morning of January 20, 2010. At an evidentiary hearing, CSO Hyram Graneau testified he excluded Fredericks for want of seating space in the courtroom. Significantly, Graneau testified the trial judge was not on the bench when the exclusion occurred. Greene placed no objection as to the alleged exclusion on the record during trial.

*Id.* at 193–94. The Third Circuit recognized the triviality exception applied to the circumstances of Greene's case. *Id.* at 195. Specifically, the Third Circuit found significant the trial judge's lack of involvement in the closure, concluding that "courts have placed considerable emphasis on the role of the trial judge in assessing whether a closure is of constitutional magnitude and have resisted ascribing to judges the unauthorized actions of courthouse personnel." *Id.* at 196. The Third Circuit concluded that the closure was limited in scope and in duration, unbeknownst to the trial judge, and without an objection from the defendant. *Id.* at 196-197. "Greene did not suffer

harm of constitutional dimension when a court security officer temporarily prevented his brother from entering the courtroom" *Id.* at 197.

The Supreme Court has never addressed the situation presented by Barnes's case, where a courtroom security officer on his own volition excludes the defendants' family from jury selection without an objection from the defendant. Where no Supreme Court decision has confronted the specific question presented to the state court, the court's decision cannot be contrary to clearly established federal law for the purposes of § 2254(d)(1). *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam).

Moreover, whether the Supreme Court would ultimately endorse the triviality exception adopted by the Circuit Courts mentioned above is unknown, but fairminded jurists could conclude that the postconviction court's dismissal of Ground Two is not inconsistent with *Waller* and *Presley*. Those cases involved total closures of the courtroom for a longer duration over the defendant's objection. Notably, the trial judge ordered the closure of the courtroom in those cases.[6] This Court cannot say, therefore, that the postconviction court's Sixth Amendment analysis was contrary to or an unreasonable application of federal law. Ground Two is without merit and is dismissed.

In Ground Three, Barnes contends that his appellate counsel was ineffective for failing to raise the issue of the courtroom closure as plain error on direct appeal. ECF 1-1 at 17. Barnes raised Ground Three in his postconviction petition. ECF 9-1 at 389-391. The postconviction court dismissed the claim, finding that counsel was not deficient because the appellate court would not have considered the issue on plain error review. *Id.* at 431-433.

---

[6]    In *Waller*, the judge granted the prosecutor's motion to close the motion to suppress hearing over the defendant's objection. *Waller*, 467 U.S. at 42. In *Presley*, the trial judge instructed Presley's uncle to leave the courtroom during jury selection over the defendant's objection. *Presley*, 558 U.S. at 210.

Indeed, the Supreme Court of Maryland in *Robinson v. State*, 410 Md. 91, 111 (2009), held that unpreserved violations of the right to a public trial are not appropriate for plain error review. The court reasoned, "had defense counsel brought to the attention of the [trial] court the lack of a full *Waller v. Georgia* analysis before exclusion of persons from the courtroom," the trial court "would have undertaken the on-the-record fact-finding and analysis required by that decision." *Id.* The court said that it was "particularly loath" to address the unpreserved issue given "that the very analysis [the defendant] complain[ed] was not done by the trial court likely would have been done had he brought the matter to the court's attention." *Id.* at 111. The court reasoned that, under the circumstances, "[i]t would be unfair to the [trial] court and prejudicial to the State to review [the defendant's] unpreserved claim of error." *Id.* at 105.

Because Maryland's highest court has ruled that plain error review is not appropriate for unpreserved errors concerning the violation of the right to a public trial, Barnes cannot establish his appellate counsel was deficient or he was prejudiced because the issue was omitted from his appeal. The postconviction court's dismissal of Ground Three is neither contrary to nor an unreasonable application of *Strickland.* Ground Three is without merit and is dismissed.

Ground Four

In Ground Four, Barnes contends that his trial counsel was ineffective for failing to object to the prosecutor's use of the "Golden Rule" argument during rebuttal. ECF 1-1 at 18-19. Barnes argues that his trial counsel should have objected to the following passage from the prosecutor's rebuttal argument:

> Imagine this, just imagine for a second—because he wants to attack the credibility of the Hinshaws in particular. Just imagine for one second you are a coke user and you have been involved in an incident where your neighbor's son is dead at the hands of your dealer, for a moment, as he's attacking the Hinshaws, put yourself for a moment in the role of Mr. Hinshaw or Mrs. Hinshaw being that drug addict, being the person who knows that this person who was alive, breathing and healthy

just 15 minutes ago, is now dead. Are you going to be nervous? Are you going to be distraught? Are you going to be in a full cooperation mode or full memory mode with the police? Are you going to tell them every single nuance?

ECF 17-8 at 123-124. Barnes argued in his postconviction petition that the prosecutor's remarks "improperly appeal[ed] to jurors' emotions and encourage[d] them to abandon their neutral factfinding role and decide the case based not on the evidence but on their interests or aroused passions." ECF No. 9-1 at 394-395. The postconviction court found that the prosecutor's comments were not improper, concluding "the prosecutor's statements seemed to be an appeal to the jurors to use their own common sense and experiences to determine if they as witnesses to a crime would be nervous, distraught, remember to tell police everything, etc.…. Petitioner's attorney's failure to object to the purported "golden rule" statements was not deficient performance." *Id.* at 438.

A "golden rule" argument is one which asks jurors to put themselves in a victim's shoes, thereby encouraging jurors to abandon their oaths to be nonpartisan and instead consider their own personal interests when determining their verdicts. *Dame v. Smith*, No. CV ELH-21-3038, 2023 WL 3688333, at *13 (D. Md. May 26, 2023). Habeas relief is available for prosecutorial misconduct only when the prosecutor's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). To demonstrate ineffective assistance of counsel arising from failure to object to the prosecutor's closing argument, the petitioner must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Lightly*, 616 F. 3d 321, 359 (4th Cir. 2010) (quoting *United States v. Wilson*, 135 F. 3d 291, 297 (4th Cir. 1998)).

The record reflects that Barnes's trial counsel dedicated a significant portion of his closing argument attacking the credibility of state witnesses, Jerry and Patricia Hinshaw. ECF 17-8 at 80-97. Barnes's trial counsel accused the Hinshaws of conveniently forgetting what they told the police (*id.*), providing inconsistent statements (*id.* at 81), engaging in "despicable" behavior (*id.* at 88), fabricating the timeline (*id.* at 91-92), engaging in a coverup (*id.* at 92) and lying (*id.* at 95, 97). The prosecutor's remarks, in response to defense counsel's attacks on the Hinshaws' credibility, were an argument to the jury that inconsistencies in the Hinshaws' statements were the result of the pressures of the situation and they should not draw a conclusion that the Hinshaws lack credibility.

The record supports the postconviction court's conclusion that the prosecutor's comments were not improper. Moreover, Barnes has failed to point to any support in the record that the prosecutor's comments were so pervasive or egregious that they denied him the right to a fair trial. The postconviction court's application of the ineffective assistance standard and analysis of the prosecutor's closing argument is neither contrary to nor an unreasonable application of federal law. Ground Four is without merit and is also dismissed.

**Conclusion**

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2); *see Buck*, 580 U.S. 100. The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional

right, a certificate of appealability shall be denied.  *See* 28 U. S.C. § 2253(c)(2).  Barnes may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate order denying the Petition for Writ of Habeas Corpus and declining to issue a certificate of appealability follows.


June 17, 2025                                          /s/
Date                                                    Stephanie A. Gallagher
                                                        United States District Judge